## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTA ALICIA MEJIA and**<br>**E.G.S., a minor,** | |
| **Plaintiffs**, | |
| v. | **Case No. 1:18-cv-02096-PLF** |
| **U.S IMMIGRATION AND CUSTOMS**<br>**ENFORCEMENT ("ICE"), ET AL.,** | **Judge Paul L. Friedman** |
| **Defendants**. | |

## PLAINTIFFS' MEMORANDUM OF LAW AND AUTHORITY IN SUPPORT OF PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Marta Alicia Mejia and her five-year-old de facto son, E.G.S., a minor child (collectively, "Plaintiffs") respectfully move this Court for a preliminary injunction enjoining Defendants U.S. Immigration and Customs Enforcement, a federal agency; U.S. Department of Homeland Security, a federal agency; U.S. Customs and Border Protection, a federal agency; U.S. Citizenship and Immigration Services, a federal agency; Thomas Homan, Acting Director, U.S. Immigration and Customs Enforcement; Daniel Bible, San Antonio Field Office Director, ICE; Andrew Huron, San Antonio Assistant Field Office Director, ICE; Kirstjen M. Nielson, Secretary, U.S. Department of Homeland Security; Jefferson Beauregard Sessions III, United States Attorney General; L. Francis Cissna, Director, U.S. Citizenship and Immigration Services; and Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection (collectively, "Defendants") from continuing to forcibly separate Ms. Mejia from E.G.S. Plaintiffs seek an order directing Defendants to immediately reunite Ms. Mejia with E.G.S. and facilitate their release from custody while her asylum case is pending.  Such relief is necessary to

ensure the integrity of Plaintiffs' substantive and procedural due process rights under the Fifth Amendment of the U.S. Constitution and their rights under the International Convention on Civil and Political Rights, the United Nations Convention Relating to Status of Refugees, 8 U.S.C. § 1158, and the International Child Abduction Convention and to avoid irreparable harm to Plaintiffs.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Marta Alicia Mejia ("Ms. Mejia"), a Honduran citizen, is the biological great-grandmother and de facto mother to five-year-old Plaintiff E.G.S. Declaration of Rhina Martinez ("Martinez Decl.") ¶ 2, attached as Ex. A.[1]  She has been E.G.S.'s legal guardian since shortly after he was born and has resided with him and cared for him all his life.  Martinez Decl. ¶ 3; Declaration of Ana Debora Mejia ("Ana Mejia Decl."), attached as Ex. C; Declaration of Alejandro Jesús García ("García Decl."), attached as Ex. D.  E.G.S. refers to Ms. Mejia as his "Mamita" ("Mommy"). Martinez Decl. ¶ 4.

Ms. Mejia's granddaughter, Ana Debora Mejia, was raped at age 18, and gave birth to E.G.S. He was born premature and required medical care that Ana Debora was unable to provide. Ana Debora granted custody to her grandmother several weeks after E.G.S. was born, and has not been involved in raising him.  *See* Ana Mejia Decl.  His biological father has had no involvement

---

[1] The factual information provided herein is drawn from the record of declarations of Ms. Mejia's relatives in the United States as cited, Ms. Mejia's August declaration in connection with her Request for Reconsideration of her negative credible fear determination, and other non-privileged factual records compiled by Raices, the organization representing Ms. Mejia with respect to other immigration matters, as cited.  Despite diligent efforts, counsel for Plaintiffs has not yet been able to secure an updated affidavit declaration from Ms. Mejia.  At counsel's request, a representative of Raices repeatedly attempted to interview Ms. Mejia this week, but was unable to meet with her due to limited facilities and extremely long wait times at the facility in which Ms. Mejia is detained. *See* Declaration of Kathrine Russell, attached as Ex. B. Counsel for Plaintiffs and Raices will continue to pursue a declaration from Ms. Mejia and will seek leave to file the declaration as a supplement to this motion as soon as possible.

in raising him.  *See* Ana Mejia Decl.  The community in which Ms. Mejia and E.G.S. lived considered her to be his mother.  *See* García Decl.; Martinez Decl. ¶ 4.

Ms. Mejia and E.G.S. fled Honduras after gang violence, long prevalent in their neighborhood, threatened their lives directly.  *See* Declaration of Marta Alicia Mejia ("Marta Mejia Decl.") ¶¶ 5-6, attached as Ex. E.  In late 2017 or early 2018, armed members of the 18th Street gang committed an armed robbery at Ms. Mejia's son-in-law's motorcycle repair shop.  See Record of Determination/Credible Fear Worksheet ("Record of Determination") at 11-12, attached as Ex. F.  Ms. Mejia lived next to the shop and was home during the robbery.  The gang members ordered her not to move and threatened to kill her and everyone in her family because they were witnesses. Record of Determination at 12.  Ms. Mejia believed if she reported the robbery the gang would certainly kill her as they threatened, and even if she did report the robbery the police would be of no help.  Record of Determination at 12.  Shortly after this traumatic event, Ms. Mejia's son-in-law suffered a heart attack and died.  Record of Determination at 12; Marta Mejia Decl. ¶ 6.

Additionally, in 2017 E.G.S.'s uncle was killed by gang members during a drug deal.  Marta Mejia Decl. ¶ 5.  The gang knew of the relationship between Ms. Mejia's family and Manuel and knew where she lived, and she feared they would continue targeting members of Manuel's family, including herself and E.G.S. Moreover, in or about December 2017, Ms. Mejia was caught in crossfire during a shoot-out between gang members and the police and narrowly escaped harm. Marta Mejia Decl. ¶ 5.

As a result of these traumatic incidents, Ms. Mejia feared she and E.G.S. would be killed by the gang if they stayed in Honduras.  Marta Mejia Decl. ¶ 5.  In or around May 2018, she fled Honduras with E.G.S. in hopes of obtaining asylum in the United States.  Marta Mejia Decl. ¶ 5; Record of Determination at 9.  Ms. Mejia and E.G.S. entered the U.S. on or about June 1, 2018 and

were detained and forcibly separated by Customs and Border Protection the next day.  Record of Determination at 1.

On June 15, an asylum officer conducted Ms. Mejia's credible fear interview.  Record of Determination at 1.  Ms. Mejia speaks no English and was disoriented and distraught; she had been separated from E.G.S. for two weeks and still had no idea where he was or how he was doing.  Marta Mejia Decl. ¶ 7.  She had no attorney.  She struggled to utilize her interpreter, who participated only by phone.  Record of Determination at 1; Marta Mejia Decl. ¶ 7.  On account of her trauma and difficulty communicating, she failed to describe several of the threats and violent incidents she experienced in Honduras and was unable to fully explain her fears that the Honduran police would help gang members target her and her family.  Marta Mejia Decl. ¶ 7.[2] Without this important information, and without adequately considering her trauma or questioning her about her fears, the asylum officer found she lacked a credible fear of persecution.  Record of Determination at 4.

On June 26, 2018, District Court Judge Sabraw certified a class in *Ms. L v. U.S. Immigration and Customs Enf't* of immigrant parents of children separated at the border prior to the issuance of the Executive Order ending that practice on June 20, 2018.  *See Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364, at \*27 (S.D. Cal. June 26, 2018) (ECF No. 82).  While making some exclusions, the class certification did not limit class members to biological parents.  Among other directives, under Judge Sabraw's order Defendants are prohibited from deporting detained parents of minor children, and are required to reunite parents and children.  Shortly before the instant motion was filed, class counsel in *Ms. L*

---

[2] These fears are consistent with the State Department's 2017 country conditions report for Honduras. *See* U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Honduras 2017 Human Rights Report* (Dep't of State, 2017).

4

reached a tentative settlement with Defendants in that case, pursuant to which Defendants agreed (among other things) to review many class members' credible fear findings *de novo* and to conduct additional credible fear interviews with counsel for class members present.   *See Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD (S.D. Cal. June 26, 2018) (ECF No. 220-1).   The proposed settlement agreement further specified that Defendants would give "due consideration... to the psychological state of the parent at the time of the initial [credible fear] interview," i.e., during the parent's period of separation from his or her family.   *Id.*

On August 7, Ms. Mejia requested reconsideration of her negative credible fear determination or, in the alternative, a new interview.   Two days later, the Houston Asylum Office rejected her request in a four-sentence form letter.   *See* Denial Letter, attached as Ex. G.   Ms. Mejia was scheduled to be deported on or about September 7, 2018.   Following an *ex parte* hearing on September 6, this Court granted Ms. Mejia's motion for an Emergency Temporary Restraining Order, enjoining the Defendants from deporting her pending further review of the merits.

Ms. Mejia remains separated from E.G.S., who continues to suffer severe and irreparable psychological trauma while separated from his "Mamita."   Martinez Decl. ¶¶ 6-8.   Following the separation, E.G.S. was placed in a foster family, where according to his accounts he was abused by his foster mother.   Martinez Decl. ¶ 7.   He was eventually released to Ms. Mejia's son and daughter-in-law.   Martinez Decl. ¶ 5.   Ms. Mejia's daughter-in-law reports that after she took custody of E.G.S., he was underweight and tired.   He slept for long periods of time and generally seemed exhausted and scared.   Martinez Decl. ¶¶ 5-8.   Even after an initial period of recovery, symptoms of the irreparable harm E.G.S. suffered and continues to suffer due to the separation persist.   Ms. Mejia describes him as a generally calm child prior to the separation, but Ms. Mejia's daughter-in-law states that since the separation and subsequent traumatic events he has been fearful and hyperactive.   Martinez Decl. ¶¶ 6, 8.   He asks about Ms. Mejia constantly and cries for her at night.

Martinez Decl. ¶ 6.   At other times, he voices his fear that Ms. Mejia has "abandoned him." Martinez Decl. ¶ 6.  Aside from reporting that his foster mother beat him, when asked for further details about his time in foster care before he came to live with Ms. Mejia's son and daughter-in-law, he gets very scared and does not respond.  Martinez Decl. ¶ 7.

**ARGUMENT**

Plaintiffs move to preliminarily enjoin the United States from forcibly separating Ms. Mejia from E.G.S. This court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

## I.    LEGAL STANDARD

A movant for a preliminary injunction "must demonstrate (1) a substantial likelihood of success on the merits, (2) that [they] would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (internal citations omitted).[3] A district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction.  *Id.*  If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are weaker.  *Id.*  Accordingly, an injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a

---

[3] Some courts in this District have recognized that if the movant's requested relief "would alter, not preserve, the status quo," the claim is subject to a somewhat higher standard.  *See, e.g.*, *Aracely v. Nielsen*, No. 17-1976, 2018 WL 3243977, at *5 (D.D.C. July 3, 2018) (internal quotation marks and citations omitted); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014). But here, Ms. Mejia has contested her separation from the moment that she was separated from her son, so the last uncontested status occurred when she and E.G.S. were approached by border agents after crossing the United States-Mexico border.  Plaintiffs' requested relief would therefore preserve, rather than alter, the status quo – that is, the "last uncontested status which preceded the pending controversy."  *Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control*, 71 F.3d 909, 913 (D.C. Cir. 1995).  Even if a heightened standard were appropriate, Plaintiffs easily satisfy that standard for the reasons discussed below.

6

relatively slight showing of irreparable injury. *Id.* With regard to success on the merits, although plaintiffs seeking a preliminary injunction have the burden of demonstrating likelihood of success on the merits, they are not required to prove their case in full at the preliminary injunction stage, but only such portions that enable them to obtain the injunctive relief that they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

## II.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Ms. Mejia and E.G.S. readily meet their burden to show likely success on the merits and irreparable harm, and that the balance of equities and the public interest weigh in their favor, thus warranting issuance of a preliminary injunction. Therefore, this court should issue a preliminary injunction to prevent Defendants from continuing to unlawfully separate them.

### A.     Likelihood of Success on the Merits

#### 1.     *Defendants Violated Plaintiffs' Due Process Rights*

Ms. Mejia has asserted various claims relating to the forced removal of E.G.S. from her care, custody, and control – a separation that occurred without any finding that she was not E.G.S.'s de facto mother, nor that she was unfit or posed a threat to her child. Their continued separation, absent any determination by Defendants that Ms. Mejia is either an unfit parent or presents a danger to E.G.S., violates their right to family integrity under the Fifth Amendment. *See Ms. L. v. U.S. Immigration and Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 WL 3129486, at *7-9 (S.D. Cal. June 26, 2018); *see also* Mem. Op. & Order, *W.S.R. v. Sessions*, No. 18-4265, at 10-15 (N.D. Ill. July 9, 2018).

Under the Due Process Clause of the Fifth Amendment, no person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. amend. V. Non-citizens on United States soil have constitutional rights, including the right to due process of law. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the

7

United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). The substantive component of the due process guarantee bars government interference with certain fundamental rights "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). There are "two strands of the substantive due process doctrine." *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016); *see Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 276-78 (D.D.C. 2011). The first strand protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience." *D.B.*, 826 F.3d at 740; *see Barnes*, 793 F. Supp. 2d at 276-78. Defendants' actions violate both strands.

First, the Supreme Court has made clear that parents have a fundamental liberty interest in family integrity, and in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) ("The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). This right is not limited to biological parents, but extends also to relatives raising children in the same household.[4] *Moore v. City of E.*

———————————————

[4] De facto parenting is well-recognized under the law, with de facto parents deemed to be on footing comparable to biological parents, as cited in Jeffrey A. Parness & Matthew Timko, *De Facto Parent and Nonparent Child Support Orders*, 67 Am. U. L. Rev. 769, 777 n.44 (2018): *see, e.g.*, Del. Code Ann. 13 § 8-203 (2009) ("Unless parental rights are terminated, a parent-child relationship established under this chapter[, which includes giving birth, adoption, de facto parenthood, and presumed parenthood,] applies for all purposes, except as otherwise specifically provided . . . ."); D.C. Code § 16-831.03(c)(1) (2001) (stating that for certain statutory proceedings involving children, "a parent and a de facto parent" are comparably "governed"); Me. Rev. Stat. Ann. tit. 19-A § 1853(1) (2016) (dictating similar applications to the Delaware Code); *Atkinson v. Atkinson*, 408 N.W.2d 516, 520 (Mich. Ct. App. 1987); *V.C. v. M.J.B.*, 748 A.2d 539, 554 (N.J. 2000) ("Once a third party has been determined to be a psychological parent to a child . . . he or she stands in parity with the legal parent."); *In re Parentage of L.B.*, 122 P.3d 161, 177 (Wash. 2005) ("We thus

8

*Cleveland*, 431 U.S. 494, 504-05 (U.S. 1977) (the right to family integrity extends to "uncles, aunts... or other relatives who occupy the same household" as the children they are raising); *see, e.g.*, *Johnson v. City of Cincinnati*, 310 F.3d 484, 499–500 (6th Cir. 2002) (recognizing a grandmother's "fundamental freedom of association right to participate in the upbringing of her grandchildren"); *Osborne v. County of Riverside*, 385 F. Supp. 2d 1048, 1054–55 (C.D. Cal. 2005) ("[C]lose relatives who have a long-standing custodial relationship with related children such that together they constitute an existing family unit possess a liberty interest in familial integrity and association.") (internal quotation marks omitted).  Consistent with this precedent, the District Court of the Southern District of California recently recognized the severe constitutional deprivation inherent in Defendants' policy of family separation and deportation and enjoined Defendants from deporting a class consisting of all "adult parents" of separated minor children.  *See Ms. L.*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist.  LEXIS 107364, at *27 (S.D. Cal.  June 26, 2018) (ECF No. 82).

As an adult parent separated at the border from her five-year-old de facto son, Ms. Mejia is a member of the *Ms. L.* class and Defendants are enjoined from deporting her and are required to reunite her within 30 days of the order, whether or not she is entitled to any other relief requested herein.  As a point of clarification, the *Ms. L.* ruling is in no way limited to biological parents.  *Id.* Notably, the *Ms. L.* court expressly excluded certain categories of parents from the class, but did *not* so exclude adoptive, de facto, or otherwise non-biological parents.  *Id.* at *17, *28 n.10 (excluding "parents with criminal history or communicable disease, or those apprehended in the interior of the country" or subject to the President's executive order prohibiting family separations after June 20, 2018).  In subsequently ordering Defendants to reunite class members and their

---

hold that henceforth in Washington, a de facto parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise.").

children, the Ms. L court repeatedly indicated that its injunction was meant to mitigate the suffering of separated "families" and "loved ones" and never once limited its concern to only biological parents and their children. *See id.* at *3-6, *11-15, *22, *25, *27-28. Accordingly, the fact that Ms. Mejia is not E.G.S.'s biological mother does not exclude her from the class.[5] At a minimum, the legal status of Ms. Mejia as a member of the Ms. L class is a legal question, and her deportation should continue to be stayed pending that determination.

Ms. Mejia's separation from E.G.S., absent any determination that she is either an unfit parent or presents a danger to him, impermissibly interferes with their fundamental right to family integrity.[6] *See Ms. L.*, 2018 WL 3129486, at *7-9; Mem. Op. & Order, *W.S.R.*, No. 18-4265, at 10-15; *see generally Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (en banc) (holding that a substantive due process claim requires a "careful description" of the asserted fundamental liberty interest).

Second, Defendants' actions in separating Ms. Mejia from E.G.S. "shock the conscience." In an effort to serve ulterior immigration goals, Defendants deprived Ms. Mejia (and thousands of other parents and guardians) of her parental rights to E.G.S., and subjected E.G.S. to profound and ongoing trauma with irreparable effects. *See* Martinez Decl. ¶¶ 6-8 (E.G.S. is exhausted and fearful,

---

[5] At a minimum, the legal status of Ms. Mejia as a member of the *Ms. L* class is a legal question, and her deportation should continue to be stayed pending that determination.

[6] In at least one prior case involving similarly situated plaintiffs, Defendants argued that detained mothers must be separated from their children because they are "unable to provide care and physical custody" for purposes of the Trafficking Victims Protection Reauthorization Act. But as this court has recognized, the fact that Ms. Mejia is lawfully detained in immigration custody does not eliminate her due process right to family integrity. *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, --- F. Supp. 3d ----, 2018 WL 3472624, at *5 (D.D.C. July 19, 2018). The TVPRA itself requires Defendants to "promptly [place unaccompanied alien children] in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). Rather than placing Ms. Mejia's de facto son in the least restrictive setting, Defendants have continued to separate him from Ms. Mejia in a manner that absolutely prevents her from providing care to, or exercising custody and control over, her de facto son.

10

thinks he has been "abandoned" and displays signs of trauma and possible physical abuse from when he was in foster care).

### 2.      *Defendants' Actions Were Not Narrowly Tailored to Serve a Compelling State Interest*

The substantial burden Defendants have imposed on Plaintiffs' rights can only be justified if it is narrowly tailored to serve a compelling state interest.  *See Goings v. Court Servs. & Offender Supervision Agency*, 786 F. Supp. 2d 48, 70 (D.D.C. 2011) (granting preliminary injunction where plaintiff's substantive due process claim premised on no-contact order prohibiting communication with his children likely would not survive strict scrutiny review); *see also Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983) (severance of relationship between parent and his child will survive constitutional scrutiny only if: (1) the government's interest is compelling; (2) there is a particularized showing of the government's interest in terminating the parental relationship; (3) it is impossible to accomplish that interest in a less restrictive way; and (4) the parties are afforded procedural due process protections); *United States v. Breeden*, No. 16-0008, 2016 WL 8943168, at *2 (D.D.C. June 3, 2016); *United States v. Godoy*, No. 10-0016, 2014 WL 12618708, at *5 (D.D.C. June 13, 2014).

Defendants do not come close to meeting this high standard.  *Abigail Alliance for Better Access to Developmental Drugs*, 495 F.3d at 702 (holding that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests... including the rights to... direct the education and upbringing of one's children" (internal quotation marks and citations omitted)).  E.G.S. is a frightened five-year-old boy in a strange new country.  He is currently many miles away from the only mother he has known, and only able to speak with her infrequently by phone. Martinez Decl. ¶ 5.  The separation imposed by Defendants precludes Ms. Mejia's involvement in any aspect of E.G.S.'s care and custody, affecting issues

11

ranging from religion to education.  Perhaps most importantly, this forced separation prevents her from providing love for, and comfort to, the child she has raised since infancy – comfort that E.G.S. surely lacks as he endures life without the only mother he has ever known in an unfamiliar environment. *See* Martinez Decl. ¶ 6 (E.G.S. is afraid that Ms. Mejia has "abandoned" him).

While the need to protect children from unfit parents may be a compelling reason for burdening family integrity, there has been no such showing here.  Thus, in the words of the United States Supreme Court, there is "little doubt that the Due Process Clause" is "offended."  *Quilloin*, 434 U.S. at 255 ("We have little doubt that the Due Process Clause would be offended [i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." (internal quotation marks and citation omitted)); *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001).

Nor does Ms. Mejia's legal status in the United States justify the separation.  She is not subject to mandatory detention, all criminal proceedings have concluded, and she has served her accompanying sentence.  She was, at most, guilty of a petty misdemeanor in the first place.  *See United States v. Dominguez-Portillo,* No. 17-4409, 2018 WL 315759, at *8 n.14 (W.D. Tex.  Jan. 5, 2018) (describing violations of 8 U.S.C. § 1325(a) as "quite literally one of the least serious federal offenses").  Furthermore, five-year-old E.G.S. has not been charged with any crime.  And the fact that Ms. Mejia may be subject to some form of immigration detention does not explain why she must be detained separately from E.G.S. The same goal of detention can be accomplished, for example, by temporarily detaining them together in a family residential facility.  *See Ms. L.*, 302 F. Supp. 3d at 1159-60.

Finally, Defendants' general interest in enforcing the immigration laws and deterring unlawful immigration cannot possibly justify the separation of Ms. Mejia from her de facto son as

narrowly constrained.  No authority suggests that attempting to deter immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective, and the novelty of Defendants' forced separation policy strongly suggests that it is not narrowly tailored.  In any event, the forced separation policy is overbroad because it equally deters both lawful and unlawful conduct.  *See, e.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-89 (D.D.C. 2015) ("[The government] maintains that one particular individual may be civilly detained for the sake of sending a message of deterrence to other Central American individuals who may be considering immigration.  This appears to be out of line with analogous Supreme Court decisions.").  This conclusion is made undeniable by the President's subsequent actions.  His June 20, 2018 Executive Order, signed days after Defendants separated Ms. Mejia from E.G.S., adopted a less restrictive alternative: temporarily detaining parents together with their children.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).[7]

### 3. *Plaintiffs Are Also Likely to Succeed on Their Statutory and Habeas Claims*

In addition to their due process claims, Plaintiffs also asserted various claims for habeas relief and claims under the International Child Abduction Remedies Act ("ICARA").  *See* Compl.

---

[7] The Executive Order did not address reunification of the children already separated from their parents at that time, as in the instant case.  On Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a related "Fact Sheet" outlining the government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal." *See* U.S. Dep't of Homeland Sec., Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification. Fact Sheet focuses on, among other things, processes for enhanced communication between separated parents and children – but only "for the purposes of removal." It does not address reunification for purposes relevant to this case, such as immigration or asylum proceedings.

US-DOCS\103246696.7

¶ 98-101.   These claims demonstrate that Defendants' actions were unlawful under various international treaties to which the United States is a signatory and, therefore, which constitute the law of the land.  U.S. Const. art.  VI.  Indeed, the chief human rights official of the United Nations recently announced that the United States policy at issue in this case violates international law and several treaties the U.S. has signed.  Nick Cumming-Bruce, *U.N. Civil Rights Chief Tells U.S. to Stop Taking Migrant Children from Parents*, N.Y. Times, June 18, 2018, https://www.nytimes.com/2018/06/18/world/europe/trump-migrant-children-un.html  (noting that this is a violation of children's rights and international law).

For the foregoing reasons, Plaintiffs have a high likelihood of success and this Court should grant this Motion for a Preliminary Injunction.

## B.      Irreparable Injury if Injunction Is Not Granted

To be irreparable, a harm must be "certain and great, actual and not theoretical, and of such imminence that there is a clear and present need for equitable relief," as well as "beyond remediation, meaning: mere injuries... in terms of money, time, and energy necessarily expended in the absence of a stay are not enough." *Fraternal Order of Police Library of Cong.  Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009).   Even a brief deprivation of constitutional rights, such as the right to family integrity, "unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.D.C. 2009) (citation omitted).

Ms. Mejia is desperate to be reunited with the child she has raised from infancy.  Meanwhile, E.G.S. is traumatized and continues to suffer from being separated from Ms. Mejia.  He is unable to sleep, asks for her constantly and continues to display symptoms of trauma, anxiety and depression, including vomiting and hyperactivity.  He also reported being abused in foster care before he was released to Ms. Mejia's daughter-in-law.  Ms. Mejia received little information about E.G.S.'s current health, well-being or daily activities while he was in custody, and even now that

he is released, she continues to receive limited information due to the communications constraints of her detention facility.

Defendants' ongoing separation of E.G.S. from his "Mamita" will likely have profound, long-term effects on E.G.S. Medical experts have documented how such separations devastate children. *See, e.g.*, Julie M. Linton, Marsha Griffin, Alan J. Shapiro, *Detention of Immigrant Children*, 139 Pediatrics 483 (Apr. 2017) ("Young detainees may experience developmental delay and poor psychological adjustment, potentially affecting functioning in school, . . . high rates of post-traumatic stress disorder, anxiety, depression, suicidal ideation, and other behavioral problems."); Petition from Mental Health Professionals: Stop Border Separation of Children from Parents, Child's World America, https://childsworldamerica.org/stop-border-separation/stop-border-separation-text-preview/ (noting the extensive research and clinical experience demonstrating negative impacts of separation of children from their parents); American Academy of Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border, May 8, 2018, https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposing SeparationofChildrenandParents.aspx ("Highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health.  This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children.").

As this Court recognized in another family separation case, "[s]eparation irreparably harms plaintiffs every minute it persists.  This evidence, combined with the constitutional violation alleged, shows that plaintiffs are not only likely – but certain – to suffer irreparable injury" if the separation were to continue. *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, --- F. Supp. 3d ----, 2018 WL 3472624, at *8 (D.D.C. July 19, 2018).  The suffering and injury is

just as certain here, even though Ms. Mejia is E.G.S.'s de facto, not biological, mother.  This Court

should issue a preliminary injunction ordering the immediate reunification of this family.

### C.     No Substantial Injury to Other Parties and Public Interest

In deciding whether to grant a preliminary injunction, the Court must "balance the

competing claims of injury and... consider the effect on each party of the granting or withholding

of the requested relief."  *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014)

(internal quotation marks and citations omitted).  Where an injunction will "not substantially injure

other interested parties," the balance of equities tips in the movant's favor.  *League of Women*

*Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted).  Defendants

"cannot suffer harm from an injunction that merely ends an unlawful practice."  *Open Communities*

*All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017).

Ms. Mejia and E.G.S. are suffering intense and irreparable harm.  E.G.S., a five-year-old

child, is in a foreign country without the only mother he has ever known.  Ms. Mejia is unable to

care for the child she has raised from birth, and lacks basic information about his health and well-

being.   Both he and Ms. Mejia continue to be deprived of their constitutional right to family

integrity.  As a member of the *Ms. L* class, Ms. Mejia should have been reunited with E.G.S. weeks

ago.  Doing so now does not appreciably hinder Defendants' efforts to reunite other remaining

families they unlawfully separated.  *Jacinto-Castanon de Nolasco*, 2018 WL 3472624 at *8-9.  And

even if it did hinder those efforts, Defendants would only have themselves, and their failure to plan

for the inevitable complications of separating thousands of families at the border, to blame.  In that

case, the appropriate remedy would be for Defendants to allocate more resources for reunification,

not for Ms. Mejia and E.G.S. to continue needlessly suffering.  *See id.*

### D.     Reuniting This Family Serves the Public Interest

The public interest weighs in favor of a preliminary injunction in this case.  An injunction would not undermine the public's interest in enforcing the criminal and immigration laws: Defendants will remain free to prosecute those who unlawfully enter the United States and institute removal proceedings against them regardless of the result of this case.  At the same time, the public has an interest in ensuring that Defendants respect the rights of immigrants to family integrity while their removal proceedings – or in this case, asylum proceedings – are pending, and to meaningfully pursue asylum in accordance with law.  *See Newby*, 838 F.3d at 12 (holding that there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations").  As Defendants have effectively acknowledged in the tentative settlement agreement in *Ms. L.*, by separating Ms. Mejia and similarly situated parents from their children, Defendants denied them their right to meaningfully participate in their asylum proceedings.  *See Ms. L. v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD (S.D. Cal.  June 26, 2018) (ECF No. 220-1) (proposing a process to re-interview class members).

Therefore, all four elements of the test governing the consideration of a preliminary injunction request demonstrate that such relief is appropriate in this case.

## CONCLUSION

Plaintiffs request that the Court preliminarily (1) enjoin Defendants from the unlawful forced separation of Ms. Mejia and her de facto son E.G.S.; (2) order that Defendants not oppose the release of Ms. Mejia and her family on their own recognizance or if deemed necessary under appropriate restrictive conditions; (3) enjoin Defendants from removing Ms. Mejia from the United States until she is reunited with E.G.S.; and (4) in the event that Ms. Mejia is not permitted to remain in the United States, enjoin Defendants from removing Ms. Mejia without her son, absent Ms. Mejia's permission or a hearing before a court where the government demonstrates that it is not in the child's best interest to be reunified with Ms. Mejia.

US-DOCS\103246696.7

Respectfully submitted this 14th day of September 2018,

/s/Timilin Sanders
Claudia O'Brien, DC Bar No. 447354
Timilin Sanders, DC Bar No. 989110
Clayton LaForge, DC Bar No. 1033938

LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
(202) 637-2200
timilin.sanders@lw.com