**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
**MARTA ALICIA MEJIA** and )
**E.G.S., a minor,** )
)
**Plaintiffs,** )
**v.** )       Civil Action No.  18-2096 (PLF)
)
**U.S IMMIGRATION AND CUSTOMS** )
**ENFORCEMENT ("ICE"),** *et al*., )
)
**Defendants.** )
_____)

**AGENCY DEFENDANTS' AND OFFICIAL CAPACITY DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES**

The U.S. Immigration and Customs Enforcement ("ICE"); the U.S. Department of

Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship

and Immigration Services (USCIS); and the individual defendants in their official capacities

hereby oppose Plaintiffs' Motion for Preliminary Injunction.[1]

Defendants respectfully submit this memorandum of points and authorities in opposition

to Plaintiff's Motion for Preliminary Injunction ("Plaintiffs' Motion").  *See* Dkt. No. 11-1.  For

the reasons set forth below, Plaintiffs have failed to establish that they are entitled to the

injunctive relief they seek.

---

[1]  Equitable relief, such as that sought in Plaintiffs' Motion For Preliminary Injunction  cannot
be obtained from a defendant sued in his or her personal capacity.  *See Hatfill v. Gonzales*, 519
F.Supp.2d 13, 25-27 (D.D.C. 2007); *Brancaccio v. Reno*, 964 F. Supp. 1, 2 n.4 (D.D.C. 1997)
(plaintiff failed to state a claim against federal officials in their individual capacities where
allegations made against them referred to actions that could only be performed by the defendants
in their official capacities and where plaintiff requested injunctive relief which could only be
performed by defendants in their official capacities).

## I.     INTRODUCTION

This Court should decline to issue the preliminary injunction sought by the Plaintiffs in this case for a number of reasons.  First, the Immigration and Nationality Act ("INA") precludes review of the merits of Ms. Mejia's negative credible-fear determination and expedited removal order.  The INA and its implementing regulations unambiguously provide that the alien is entitled to no further review of his admissibility or, beyond an immigration judge, his negative credible-fear determination, from either the Board of Immigration Appeals ("BIA") or federal courts.  8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.").  Second, *Ms. L v. U.S. Immigration & Customs Enf't*, 302 F.Supp. 3d 1149, 2018 WL 2725736 (S.D. Cal. June 6, 2018) does not apply to the Plaintiffs.  The court certified the following class in *Ms. L*:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR[2] custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

*Id.*, at 17.  The only exclusions to the class certification were "parents with a criminal history or [a] communicable disease, or those who are in the interior of the United States or subject to the EO."  *Id*.  The Court's Order mentions nothing about aunts, uncles, great-grandparents or other extended family members.  At the time that Ms. Mejia unlawfully entered the United States, she admitted that she was not E.G.S.'s mother and had no paperwork to establish her relation to E.G.S.

---

[2] Office of Refugee Resettlement.

Finally, U.S. Border Patrol agents did not abuse their discretion in designating E.G.S. as an unaccompanied alien child ("UAC") when they encountered him.  Given that proper designation, the Trafficking Victims Protection and Reauthorization Act ("TVPRA") required E.G.S.'s transfer to the custody of the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR").  Thus, Plaintiffs cannot succeed on the merits, and their request for a Preliminary Injunction should be denied.

## II.    FACTUAL BACKGROUND

Plaintiff, Marta Alicia Mejia (Marta) entered the United States illegally bringing with her the minor child, E.G.S.  Marta claims to be E.G.S' maternal great-grandmother.  *See* ECF 13-1. However, pursuant to applicable statutes, E.G.S. is considered an unaccompanied minor because Marta is not his mother.  Plaintiff Marta has gone through expedited removal proceedings and a final order of deportation has issued.  This Court issued a temporary injunction staying Marta's deportation until a decision on Plaintiffs' Motion for Preliminary Injunction.  E.G.S., the minor child has been released from custody to a relative sponsor.

## III.    LEGAL BACKGROUND

### A.    The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 IIRIRA") And Expedited Removal.

The Supreme Court has long recognized that Congress exercises "plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden." *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Pursuant to that longstanding doctrine, "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Alien applicants for admission at the border thus lack any constitutional due process rights with respect to admission:

"[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), and "it is not within the province of any court, unless expressly authorized by law, to review [that] determination." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

In 1996 Congress exercised its authority over immigration by passing IIRIRA and replacing much of the INA with a new and "comprehensive scheme for determining the classification of … aliens," *Camins v. Gonzales*, 500 F.3d 872, 879 (9th Cir. 2007), including expedited removal. Prior to 1996, the INA "'established two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings.'" *Vartelas v. Holder*, 566 U.S. 257, 261 (2012) (quoting *Plasencia*, 459 U.S. at 25). Exclusions—which accorded aliens fewer procedural rights than deportations—were for "aliens seeking entry to the United States," while deportation hearings were for "aliens who had already entered this country." *Id.* "Under this regime, 'entry' into the United States was defined as 'any coming of an alien into the United States, from a foreign port or place.'" *Id.* (quoting 8 U.S.C. § 1101(a)(13) (1988 ed.)). Thus, "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010).

Congress passed "IIRIRA [to] address[] this anomaly by," eliminating the concept of "entry" and exclusion and deportation proceedings, whilst creating instead a uniform "removal" procedure. *Id.*; *see also Vartelas*, 566 U.S. at 261–62. Removability now turns on whether an alien is admissible or has been "admitted," defined as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Aliens

arriving in the United States or present in the United States without having been admitted are now "applicants for admission," *id.*, § 1225(a)(1), and generally aliens "seeking admission" who fail to "clearly and beyond a doubt" demonstrate an entitlement "to be admitted," are detained for a removal proceeding pursuant to 8 U.S.C. § 1229a.

Nevertheless, IIRIRA preserved some elements of the former distinction between exclusion and deportation, including through the statutory enactment of expedited removal proceedings, which ensures that the Executive could both "expedite removal of aliens lacking a legal basis to remain in the United States," *Kucana v. Holder*, 558 U.S. 233, 249 (2010); *see* S. Rep. No. 104-249 (1996), and to deter individuals from exposing themselves to the dangers associated with illegal immigration, H.R. Rep. No. 104-469, pt. 1, at 117 (1996). "Hence, the pivotal factor in determining" what sort of proceeding an alien is entitled to "will be whether or not the alien has been lawfully admitted," not whether he steps upon United States soil. *Id.* at 225.

In this way, expedited removal was one of several critical tools for dealing with the "crisis at the land border, allowing hundreds of thousands of illegal aliens to cross each year[.]" *Id.* at 107. Congress was concerned that "the lack of detention space and overcrowded immigration court dockets" would cause many arriving aliens lacking valid entry documents to be "released into the general population," never to return for removal hearings. *Id.* at 117. Congress also sought to deter aliens from making the dangerous journey to the United States. *Id.* Congress thus conferred sizable authority to Executive officers while limiting judicial review to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United

States, while providing an opportunity for such an alien who claims asylum to have the merits of his … claim promptly assessed[.]" H.R. Rep. No. 104-828, at 209-10 (1996).

In 2004, the U.S. Department of Homeland Security ("DHS") issued a regulation pursuant to 8 U.S.C. § 1225(b)(l)(A)(iii)  designating expedited removal to apply to unadmitted, non-paroled aliens apprehended within 100 miles of the border who cannot show that they have been physically present in the United States continuously for the fourteen-day period immediately preceding the date of their apprehension. *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877, 48,878–80 (Aug. 11, 2004). Such designation aimed to ensure that expedited removal could be applied to "the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry." *Id.*

Thus, under IIRIRA, if an alien apprehended at or near the border is inadmissible under 8 U.S.C. § 1182(a)(7) because he lacks proper documentation, an immigration officer may "order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1225(b)(1)(A)(iii); 69 Fed. Reg. at 48,877. If an alien lacking documentation and subject to expedited removal expresses a fear of persecution or torture, he is referred for an interview before an asylum officer ("AO"), who interviews the alien, reviews relevant facts, and determines initially whether the alien has a credible fear. *Id.* § 1225(b)(1)(B); 8 C.F.R. § 208.30. Credible fear exists where there is a "significant possibility," taking into account the credibility of the statements made by the alien in support of her claim and other facts known to the officer, that the alien could establish eligibility for asylum under 8 U.S.C. § 1108, withholding of removal under 8 U.S.C. § 1231(b)(3), *see id.* § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2), or withholding or deferral of removal under the Convention Against Torture

("CAT"). 8 C.F.R. § 208.30(e)(3). The AO creates "a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture." *Id.* § 208.30(e)(1); *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(II). If the AO concludes the facts do not satisfy that standard, a supervisory asylum officer must also review the determination before the United States Citizenship and Immigration Services ("USCIS") issues its screening determination. *See* 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7).

If the alien receives a negative credible fear determination from USCIS, he may request de novo review of the finding by an Immigration Judge (IJ), who is an administrative hearing officer of the United States Department of Justice, Executive Office for Immigration Review. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(d). The review includes an opportunity for the alien to be heard and questioned by the IJ, who also may take into evidence any relevant oral or written statement. *Id.*; 8 C.F.R. § 1003.42(c). The alien may consult with a person of her own choosing prior to the review, provided the consultation is "at no expense to the Government" and does not "unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); see 8 C.F.R. §§ 1003.42(a), (b), (c). The IJ, in his or her discretion, may also allow the "consulted" person to be present during the review.

If either the AO or the IJ find the alien possesses a credible fear, expedited removal proceedings are terminated and the alien is referred for removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. §§ 208.30(f), 1208.30(g)(2)(iv)(B), 1003.42(f). If the AO (along with his supervisor) and the IJ all determine that credible fear has not been established, the alien may be removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii); 8 C.F.R. §§ 208.30(g),

1208.30(g)(2)(iv)(A). The alien is entitled to no further review, direct or collateral, of the negative credible fear determination or expedited removal order (other than in circumstances inapplicable here), 8 U.S.C. §§ 1225(b)(1)(C)–(D), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f), nor reconsideration by USCIS. See 8 C.F.R. § 1208.30(g)(2)(iv)(A).

**B.  Statutes Governing the Custody of Unaccompanied Children.**

     *i.*    *The Homeland Security Act of 2002 ("HSA")*

In 2002, Congress enacted the HSA.  Pub. L. No. 107-296, 116 Stat. 2135. The HSA created the U.S. Department of Homeland Security ("DHS"), transferring most immigration functions formerly performed by INS to the newly-formed DHS and its components, including U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE. See also Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Congress transferred to the U.S. Department of Health and Human Services ("HHS"), the responsibility for the care of UACs "who are in Federal custody by reason of their immigration status." HSA § 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A). The HSA defines an "unaccompanied alien child" as: a child who-

> (A) has no lawful immigration status in the United States;
> (B) has not attained 18 years of age; and
> (C) with respect to whom-
> > (i) there is no parent or legal guardian in the United States; or
> > (ii) no parent or legal guardian in the United States is available
> > to provide care and physical custody.

6 U.S.C. § 279(g)(2). The HSA also transferred to HHS the responsibility for making all placement decisions for UACs, and required HHS to coordinate these placement decisions with DHS. Finally, the HSA prohibited HHS from releasing UACs on their own recognizance. *See* 6 U.S.C. § 279(b)(l)(C), (D), (b)(2).

ii.     *Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")*

The TVPRA was signed into law on December 23, 2008. The TVPRA codified

protections related to the processing and detention of unaccompanied alien children ("UACs").

The TVPRA requires that "the care and custody of all unaccompanied alien children, including

responsibility for their detention, where appropriate, shall be the responsibility of the Secretary

of Health and Human Services." 8 U.S.C. § 1232(b)(1) (emphasis added).  It also requires that:

> Except in the case of exceptional circumstances, any department or
> agency of the Federal Government that has an unaccompanied
> alien child in custody shall transfer the custody of such child to the
> Secretary of Health and Human Services not later than 72 hours
> after determining that such child is an unaccompanied alien child.

8 U.S.C. § 1232(b)(3).

The TVPRA made clear that HHS, and not DHS or its components, is responsible for all

placement decisions for UACs in its custody, and provides guidelines for the reunification of

UACs by HHS, including dictating the requirements for HHS to evaluate the suitability of any

placement. 8 U.S.C. § 1232(c)(3). The TVPRA does provide that a child may be placed with a

proposed custodian, but the UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the
> proposed custodian is capable of providing for the child's physical and mental
> well-being.  Such determination shall, at a minimum, include verification of the
> custodian's identity and relationship to the child, if any, as well as an independent
> finding that the individual has not engaged in any activity that would indicate a
> potential risk to the child.

8 U.S.C. § 1232(c)(3)(A).

The statute further requires that UACs who remain in HHS custody must be "promptly

placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C.

§ 1232(c)(2). It delegates to the Secretary of HHS the authority to make such placement

decisions, considering "danger to self, danger to the community, and risk of flight." *Id.* Staff

from HHS, Office of Refugee Resettlement ("ORR") make an initial care provider placement decision for each UAC. *See* Office of Refugee Resettlement, ORR Policy Guide: Children Entering the United States Unaccompanied ("ORR Guide") § 1.3.2, http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied. The majority of care providers operate one of three types of facilities: shelter-type facilities, staff secure facilities, or secure facilities. *Id.* § 1.1. Shelter care is a residential care facility in which all programs are administered on-site, in the least restrictive setting. *See* ORR Guide: Guide to terms. Staff secure facilities maintain stricter security measures than shelters, such as a higher staff-to-UAC ratio for supervision and a secure perimeter with a "no climb" fence. *Id.* Secure facilities are the most restrictive level of care, and are physically secure structures with staff who are able to control violent behavior and may be a licensed juvenile detention center or a highly structured therapeutic facility. *Id.* Plaintiff E.G.S. has been released from ORR care to a family member sponsor.

## IV.    STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions are "extraordinary and drastic remed[ies]" that can only be granted "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Gold v. Maurer*, No. 17-cv-734, 2017 WL 1628873, at *3 (D.D.C. May 1, 2017); *Gerber Prods. Co. v. Vilsack*, No. 16-cv-1696, 2016 WL 4734357, at *3 (D.D.C. Sept. 9, 2016).  Specifically, a plaintiff must show: (1) a substantial likelihood of success on the merits; (2) that plaintiff would suffer irreparable harm absent an injunction; (3) that the balance of equities tips in plaintiff's favor; and (4) that the public interest will be furthered by the injunction.  *See*, *e.g.*, *Gold*, 2017 WL 1628873, at *3.

Moreover, when "the injunction requested is a mandatory one that would require defendant to undertake 'some positive act,' the movant 'must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.'" *Sai v. TSA*, 54 F. Supp. 3d 5, 8 (D.D.C. 2014) (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998)); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.").

## V.    ARGUMENT

Plaintiffs cannot satisfy the exacting standard for issuance of the injunctive relief they seek.  Accordingly, the Court should deny their motion.

### A.    Injunctive Relief Is Not Appropriate Where Plaintiffs Do Not Seek to Preserve the Status Quo

This court may issue a preliminary injunction only when the movant demonstrates that:

(1) there is a substantial likelihood plaintiff will succeed on the merits;
(2) plaintiff will be irreparably injured if an injunction is not granted;
(3) an injunction will not substantially injure the other party; and
(4) the public interest will be furthered by an injunction.

*Barton v. District of Colum.*, 131 F. Supp. 2d 236, 241 (D.D.C. 2001) (quoting *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011; *Banks v. Harrison*, 864 F. Supp. 2d 142, 145 (D.D.C. 2012).[3]  Moreover, it has been

---

[3] Traditionally, courts have analyzed those factors on a "sliding scale," balancing them against each other.  *Barton*, 131 F. Supp. 2d at 241 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) (citations and quotation omitted).  Under that

recognized that the standard for a preliminary injunction should be heightened when, as here, "a plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (i.e., a mandatory injunction)." *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018) (citing *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases)). Under that heightened standard, "the moving party must "clearly" show that "he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 1998 U.S. App. LEXIS 7871, at *2 (D.C. Cir. 1998) ("we need not reach the question of whether the district court erred in holding that the standard applicable to a mandatory preliminary injunction is higher than that applicable to a prohibitory preliminary injunction because, as the district court also held, the appellants fail even under the lower standard that they advocate").

Here, the Plaintiffs requests "preliminary" injunctive relief that is one and the same with the ultimate relief sought in this case—the release of both Plaintiff Mejia and her grandson into the United States. Plaintiff's motion thus inverts the fundamental purpose of preliminary injunctive relief, which is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In this circuit, mandatory

---

approach, the "four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted." *Id.* But, "[r]ecently, the continued validity of that approach has been called into some doubt, as the . . . [D.C.] Circuit has suggested, without holding, that a likelihood of success on the merits is an independent free-standing requirement for a preliminary injunction." *TD Bank NA v. Pearl*, 891 F. Supp. 2d 103, 106 (D.D.C. 2012). Judges in this Circuit have also suggested that "a party moving for a preliminary injunction must meet [all] four independent requirements." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J. & Henderson, J., concurring). The Court need not resolve that open question here because Plaintiffs' claims do not satisfy either standard.

injunctions such as this are "ordinarily cautiously viewed and sparingly issued." *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978).

      B.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.

      A. Neither Plaintiff is in Custody Within the Jurisdiction of This Court

      Plaintiffs do not allege that they are in custody within the jurisdiction of this Court. First, as an initial matter, Plaintiff E.G.S. is no longer in custody.  Plaintiffs acknowledge that the minor child has been released to family-member sponsor. Second, Plaintiff Mejia does not claim that she is detained within the jurisdiction of this Court.  Accordingly, to the extent Plaintiff Mejia asks this Court to release or transfer her for the purpose of reunification through a writ of *habeas corpus* under 28 U.S.C. § 2241, this Court lacks jurisdiction over such claims because they must be directed at the person with custody and control over Plaintiffs, and that person would be not be located in the District of Columbia. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (For "core" habeas challenges—defined as "challenges to present physical confinement"—brought under 28 U.S.C. § 2241, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."); *see also* 28 U.S.C. § 2243 (providing that "[t]he writ, or order to show cause, shall be directed to the person having custody of the person detained."). Accordingly, this Court lacks jurisdiction to order the relief requested in Plaintiffs' motion to the extent it requires the court to order the release or transfer of Plaintiff or her grandson through a writ of *habeas corpus*. *See Padilla*, 542 U.S. at 443 ("[F]or core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); *see also id.* at 442-43 (citing *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 495

(1973)) (stating that to have jurisdiction over a habeas action, a federal court must have jurisdiction over the properly named custodian).

Moreover, this Court also cannot order ICE to release Plaintiff Mejia because such release is available only through parole, and the discretion to make decisions regarding parole has been specifically delegated to DHS by statute. *See* 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ."); 8 C.F.R. §§ 235.3(b)(2)(iii); 235.3(b)(4)(ii) (parole of aliens mandatory detention who are awaiting a credible fear determination or who have not expressed a fear of return "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective."). The Supreme Court has recognized that a decision unambiguously "specified by statute 'to be in the discretion of the [Government]'"—as in 8 U.S.C. § 1182(d)(5)(A)—is "shielded from court oversight by § 1252(a)(2)(B)(ii)." *Kucana v. Holder*, 558 U.S. 233, 248 (2010); 8 U.S.C. § 1252(a)(2)(B)(ii) ("no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .").

More recent cases have recognized the non-reviewability of parole determinations in light of § 1252(a)(2)(B)(ii). *Milardo v. Kerilikowske*, No. 3:16-MC-99, 2016 WL 1305120, *6, 9 (D. Conn. Apr. 1, 2016) (ICE's discretionary parole decisions are "generally not subject to judicial review, and [are] never subject to judicial review by a district court"); *United States v. Bush*, No.

CR 12-92, 2015 WL 7444640, *1 (W.D. Pa. Nov. 23, 2015) (finding that section

1252(a)(2)(B)(ii) "explicitly denies courts the jurisdiction to review" parole decisions, "except

insofar as those claims raise constitutional issues, then only the appropriate court of appeals shall

hear the case"); *Naul v. Gonzales*, No. 05-4627, 2007 WL 1217987, *2-*3 (D.N.J. Apr. 23,

2007) (parole denial pursuant to § 1182(d)(5)(A) "is a discretionary decision outside this Court's

review"). Because ICE's decision whether to parole Plaintiffs fathers is clearly committed to its

discretion under the statute, that decision is not subject to review by this Court, and this Court

correspondingly cannot grant Plaintiffs the relief they seek to the extent it would require the

Court to order ICE to exercise its discretion to parole Plaintiffs.

C.       The Court Lacks Jurisdiction Over Plaintiff Mejia's Expedited Removal

The Supreme Court has long recognized that Congress exercises "plenary power to make

rules for the admission of aliens and to exclude those who possess those characteristics which

Congress has forbidden." *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Pursuant to that

longstanding doctrine, "an alien seeking initial admission to the United States requests a

privilege and has no constitutional rights regarding his application, for the power to admit or

exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)

(O'Connor, J.). Alien applicants for admission at the border thus lack any constitutional due

process rights with respect to admission: "[w]hatever the procedure authorized by Congress is, it

is due process as far as an alien denied entry is concerned," *Shaughnessy v. United States ex rel.

Mezei*, 345 U.S. 206, 212 (1953), and "it is not within the province of any court, unless expressly

authorized by law, to review [that] determination." *United States ex rel. Knauff v. Shaughnessy*,

338 U.S. 537, 543 (1950).

Congress has unambiguously limited federal habeas jurisdiction over expedited removal

orders or negative credible fear findings. Under the INA, "[n]otwithstanding any other provision of law (statutory or nonstatutory), including *section 2241 of title 28, United States Code*, or any other *habeas corpus* provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review" expedited removal orders or credible fear determinations other than as provided for at 8 U.S.C. § 1252(e). 8 U.S.C. § 1252(a)(2)(A) (emphasis added). Section 1252(a) makes clear that, other than as permitted by section 1252(e), "no court shall have jurisdiction to review" (i) "any individual determination or to entertain *any* other cause or claim *arising from or relating to* the implementation or operation of an order of removal pursuant to section 1225(b)(1)"; (ii) "a decision by the Attorney General to invoke the provisions of such section," (iii) "the application of such section to individual aliens*, including the [credible fear] determination* made under section 1225(b)(1)(B)"; and (iv) "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)." *Id.* (emphases added).

Subsection 1252(e)(1) provides that no court may enter "declaratory, injunctive, or other equitable relief" pertaining to an expedited removal order except as "specifically authorized in a subsequent paragraph of this subsection." Subsection 1252(e)(2) then provides for circumscribed judicial review of three discrete issues Plaintiff admits are not present in the instant action: (1) "whether the petitioner is an alien;" (2) "whether the petitioner was ordered removed" under 8 U.S.C. § 1225(b)(1); and (3) whether the alien can demonstrate that he had been admitted to permanent residence or granted asylum prior to his expedited removal, such status having not having been terminated. Moreover, in conducting review under section 1252(e)(2), "the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." *Id*. at § 1252(e)(5). And even if some basis for review exists under section

1252(e)(2), "the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title." *Id.* at § 1252(e)(4). Although section 1252(e) provides for review in limited circumstances, as described above, even where review if permitted, prohibits the entry of a stay of removal.

Section 1252(e)(3) does not authorize the court to enter a stay of removal pending resolution of a challenge under that provision. Indeed, section 1252(e)(1), which limits the scope of relief the Court can provide under 1252(e)(2) and (3) provides that "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter *declaratory, injunctive, or other equitable relief* in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection*." 8 U.S.C. § 1252(e)(1). No other "subsequent paragraph" of section 1252(e) authorizes courts to enter a stay of removal. Indeed, section 1252(e)(3) is completely silent on this point, so cannot be read to *affirmatively* authorize what section 1252(e)(1) explicitly forbids. Indeed, Congress' clear intention through section 1252(e)(3) was to provide review of the written "procedures and policies" "implement[ing]" the "system" as a whole, or any new such procedures and policies issued at a later time, not review of the propriety of all individual removal orders issued during a systemic challenge's pendency. *Id.* §§ 1252(a)(2)(A)(iv), 1252(e)(3)(A).

Plaintiffs' request for preliminary injunction should also be denied because this Court lacks jurisdiction to enjoin removals. Under 8 U.S.C. § 1252(g), "[e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or

execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added); *see Jennings*, 138 S. Ct. at 839–41 (plurality) (district court lacks jurisdiction over challenge to "decision to . . . seek removal."); *id*. at 854–59 (Thomas, J., concurring in judgment) (stating that the INA bars any "aliens' claims related to their removal" unless raised in accordance with the rest of section 1252). Because Plaintiffs' motion is in substance a "challenge to the execution of the removal," section 1252(g) bars the Court from issuing a stay other than as permitted elsewhere by section 1252. *See Kwai Fun Wong v. United States*, 373 F.3d 952, 964 (9th Cir. 2004) (equal-protection claim not barred by section 1252(g) because plaintiff "disclaim[ed] any challenge to the execution of the removal itself"); *accord Duron v. Johnson*, --- F. 3d ---, 2018 WL 3731052, at *3 (5th Cir. Aug. 6, 2018) (holding that a claim "on behalf of an alien" that "arises from the decision to 'execute a removal order,' . . . is subject to section 1252(g)'s jurisdictional bar"). And that is so even "even if the claim is for a short stay while [Plaintiffs] seek[] additional administrative remedies." *Diaz-Amezcua v. Johnson*, No. C14-1313 MJP, 2015 WL 419029, at *3 (W.D. Wash. Jan. 30, 2015) (Plaintiffs' "request to stay [their] removal arises from the decision or action by the Attorney General to execute [their] removal order, and this Court therefore lacks jurisdiction to hear such a claim"); *see, e.g., Rosales v. Aitken*, No. 11–CV–4246, 2011 WL 4412654, *3, 2011 U.S. Dist. LEXIS 108256, *7 (N.D. Cal. Sep. 21, 2011) (similar); *Mejia–Espinoza v. Mukasey*, Case No. CV 08–7984–FMC, 2009 WL 235625, *3 (C.D. Cal. Jan. 27, 2009) (similar).

 For all of the above reasons, this Court has no jurisdiction to review the merits of Ms. Mejia's negative credible-fear determination and expedited removal order, or to stay her removal.

D.     Plaintiffs Are Not Likely To Succeed On the Merits of Their Constitutional
       Claims

Plaintiffs claim a likelihood of success on the merits by seeking to compare the issues in

this case to the family separation issues that are at issue in the ongoing litigation in *Ms. L. v. ICE*,

No. 18-cv-428 (S.D. Cal.). However, *Ms. L*, and the issues before the Court therein, are

fundamentally different from the separation that occurred in this case. In this case, DHS's

separation of Plaintiff from her grandson were mandated by the plain terms of the TVPRA, and

were consistent with a primary purpose underlying that statute which was to prevent the

trafficking of minors into the United States. This is because unlike the class members and their

children in *Ms. L.*, Plaintiff E.G.S. did not arrive in the United States with a parent, but rather

with his great grandmother, and therefore at the time he was taken into DHS custody Plaintiff

E.G.S. had no parent "available to provide care and physical custody," and was automatically

required to be treated as a UAC under the terms of the HSA. 6 U.S.C. § 279(g)(2). Because he

was a UAC, DHS was mandated to transfer custody of him to HHS within 72 hours of making

that determination. 8 U.S.C. § 1232(b)(3). And Plaintiff release from HHS custody therefore was

subject to the requirement of the TVPRA that HHS identify and vet a suitable sponsor to whom

she may be released. *See* 8 U.S.C. § 1232(c)(3)(A).

In ruling on the preliminary injunction in *Ms. L.*, the Court there noted that the reunification

procedure under the TVPRA "was not designed to deal with the present circumstances[]" of

children separated from their parents, because "ORR's reunification process was designed to

address the situation of children who come to the border or are apprehended outside the company

of a parent or legal guardian." *Ms. L.,* ECF No. 83, at 16; *see also id.* at 7 ("For children placed in

federal custody, there are two options. One of those options is ORR, but it was established to

address a different problem, namely minor children who were apprehended at the border without

their parents, i.e., true 'unaccompanied alien children.' It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents."). Thus, the *Ms. L.* Court implicitly recognized that the situation that occurred here, where Plaintiff was apprehended outside the company of a parent or legal guardian, is precisely one that the TVPRA and ORR's reunification procedures were designed to address. And this distinction is important, because *Ms. L.* Court's due process ruling was based at least in part on its belief that the government's separation of parents and children, and failure to later reunify them, was occurring in a manner the Court believed were not anticipated by, or consistent with, the TVPRA. *Id.* at 16-17. Here, Plaintiff's transfer to HHS, and continued custody with HHS until a suitable sponsor can be located, are precisely of the type that the TVPRA was designed to cover, and thus the due process analysis from *Ms. L.* simply does not apply.

It is also important to note that there is good reason why the TVPRA requires the separation of a child from adults who are not that child's parent or a verifiable legal guardian, and why the TVPRA procedures should not be circumvented when children are apprehended in the absence of a parent or verifiable legal guardian. That is because the statute was designed to balance the interests of protecting children from trafficking, while also allowing for family reunification in a manner that protects the best interest of the child. *See* 154 Cong. Rec. 10887 (Senator Feinstein noting that the "legislation also requires, whenever possible, family reunification or other appropriate placement in the best interest of the unaccompanied alien children" subject to the processes contained in the statute). While the statute makes special accommodation for the rights of a parent or legal guardian, *see id.,* (The statute "does not interfere with the custodial rights of a parent or guardian in situations where a parent or guardian seeks to establish custody"), the statute's protections are purposely applied to all other family

relationships.  And there is good reason for this. Foregoing the protections of the TVPRA on a mere claim that a family member or purported family member has close ties to a child opens up a slippery slope that can be easily exploited by the very people against whom the TVPRA is designed to protect these children. For this reason, there is good reason why Congress enacted the TVPRA's provisions that required the separation of Plaintiff from her sister in this case, and there is further good reason to find that Defendants did not violate Plaintiff's due process rights by transferring her to the custody of HHS in accordance with the requirements of the TVPRA.

Finally, Plaintiffs have failed to establish that they has any constitutional right to be detained (or released) together, particularly in light of the fact that the existing framework governing Plaintiff Mejia's custody does not provide for such detention (or release). In essence, Plaintiffs asks this Court to recognize a constitutional right of immigration detainees to be detained with their family members. However, the extent of any right that family members may have necessarily depends on the circumstances of a particular case. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned). Moreover, Congress has broad power to regulate immigration, even when Congress' decisions touch on sensitive familial relationships. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 797-98 (1977).

The courts have rejected attempts to establish that individuals in detention—whether aliens or U.S. citizens—have any substantive due process right to family visitation, or to detention in proximity to family members, let alone a right to be detained—much less released—together. *See, e.g., Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007) (rejecting the notion of a due process right to family visitation in immigration detention). Relying on *Aguilar*, the U.S. District Court for the Eastern District of California recently held:

The Court has been unable to find a Ninth Circuit case that addresses the specific issue of whether immigration detention and transfers violate the substantive due process right to family integrity. However, there is a First Circuit case that the Court finds instructive and persuasive . . . . The *Aguilar* class alleged that ICE's actions violated, *inter alia*, their substantive due process rights of family integrity and of parents to make decisions as to the care, custody, and control of their children.

* * *

The Court recognizes the burden Petitioner's immigration proceedings and prolonged detention has placed on his family and is sympathetic to his situation. However, no authority has been presented to this Court that holds an immigration detainee has a due process right to be placed in a facility near his family in order to facilitate visitation . . . . Petitioner has not alleged that government action resulted in termination of his parental rights or interfered with his right to make fundamental decisions regarding his children's upbringing.

See *Milan-Rodriguez v. Sessions*, No. 116CV01578AWISABHC, 2018 WL 400317, at *8-10 (E.D. Cal. Jan. 12, 2018) (citations omitted); *see also Gallanosa by Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children."); *Gordon v. Mule*, 153 F. App'x 39, 42 (2d Cir. 2005) (citing Government's plenary power over immigration to reject claim that removal violates substantive due process right to family unity).

For all of the reasons discussed above, Plaintiff Mejia's placement in the custody of ICE, and her grandson's custody (and subsequent release) by ORR, are valid exercises of immigration enforcement, and the framework that governs their custody and detention respectfully does not provide for them to be detained (or released) together in the manner that Plaintiffs seek. This is even more true considering that these cases all address a parent/child relationship, and that the grandparent relationship here may reasonably be considered to be less compelling for purposes of determining a constitutional right, particularly where the TVPRA explicitly treats that relationship

differently from that of a parent and child. Plaintiff ignores this framework and the requirements of the TVPRA, but provides no basis to find that this separation was the result of anything other than the valid operation of that statute. Put simply, Plaintiffs' attempts to shoehorn this case into the framework of other "family separation" cases involving parents and children should fail because Plaintiffs entirely fail to acknowledge the very different legal framework at issue here.

E.     The Balance of the Interests and the Public Interest Weighs Against Granting Plaintiffs' Motion.

As discussed above, E.G.S. was in HHS custody because Border Patrol reasonably exercised its discretion in determining that he was a UAC, and then complied with the TVPRA in turning him over to HHS.  HHS further complied with the TVPRA in assuring itself that E.G.S. could be released in a manner that assures that he is being transferred from government custody to a safe and suitable custodian. All of these decisions and processes are designed to ensure the safety of UACs, and there is a strong public interest in assuring that they are not circumvented in individual cases in a manner that undercuts the statute's purpose.

Any order that enjoins a governmental entity from enforcing the law or interferes with an adjudication constitutes an irreparable injury to the government that weighs heavily against the entry of injunctive relief. *See, e.g., New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). The hardship of separation to a grandmother and her grandson cannot be denied, but neither can the governmental and public interests in protecting children from exploitation by smugglers and human traffickers. Those interests would be irreparably harmed by interference with ICE/ERO's discretion to transfer children to the care and custody of ORR over concerns about their safety and welfare and/or with ORR's determination of placement with a suitable sponsor.

It is well-settled that the public interest in enforcement of United States immigration laws is significant. *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981)

(citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975) (additional citation omitted)).   Plaintiffs ask this Court to intervene in an area where the actions about which they complain have clearly been delegated to the authority of Border Patrol and HHS in the Immigration and Nationality Act and the TVPRA. Because these statutes implicate immigration policy as well as the safety of minors, there is a further interest in ensuring that the agencies are able to reasonably exercise their delegated authority.

Thus, because the balance of hardships and public interest weigh in favor of Defendants, the Court should deny Plaintiffs' request for preliminary injunctive relief.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion for injunctive relief.

Respectfully submitted,

JESSIE K. LIU,
D.C. Bar #472845
United States Attorney
District of Columbia

DANIEL F. VAN HORN
D.C. Bar #924092
Chief, Civil Division

By:   */s/ Heather Graham-Oliver*
Heather Graham-Oliver
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2520 (phone)
(202) 252-2599 (fax)
Heather.graham-oliver@usdoj.gov